IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**GEOLOGIC COMPUTER SYSTEMS,
INC.**

               Plaintiff,

v.

**MACLEAN, ET. AL.**

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Civil Action No. 2:10-cv-13569
Hon. Judge Arthur J. Tarnow
Magistrate Judge R. Steven
Whalen

## <u>DEFENDANTS' RESPONSE IN OPPOSITION<br>TO PLAINTIFFS' MOTION FOR CONTEMPT [DKT. 196]</u>

DEFENDANTS AMW MACHINE CONTROL INC., AMW GROUP

LLC, MARK WILLIAMS, AND ALAN WILLIAMS ("Defendants"), by and

through their undersigned attorney, Thomas P. Heed, respectfully submit this

Response and Brief in Opposition to Plaintiffs' Motion for Contempt [Dkt. 196].

WHEREFORE, Defendants respectfully request this Honorable Court deny

Plaintiff's Motion for Contempt, modify the permanent injunction [Dkt. 191] to

terms consistent with this Court's findings, and impose costs and fees on the

Plaintiffs and their Declarants.

1

Dated: May 21, 2018                    Respectfully Submitted
HEED LAW GROUP PLLC

/s/ Thomas P Heed
Thomas P. Heed
39555 Orchard Hill Place, Suite 600
Novi, MI 48375
(248) 465-8655
theed@heedlawgroup.com

**Attorney for Defendants
    AMW MACHINE CONTROL INC.
    AMW GROUP LLC
    MARK WILLIAMS
    ALAN WILLIAMS**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**GEOLOGIC COMPUTER SYSTEMS, INC.**

               Plaintiff,

v.

**MACLEAN, ET. AL.**

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Civil Action No. 2:10-cv-13569
Hon. Judge Arthur J. Tarnow
Magistrate Judge R. Steven Whalen

**DEFENDANTS BRIEF IN SUPPORT OF ITS
RESPONSE IN OPPOSITION TO
<u>PLAINTIFFS' MOTION FOR CONTEMPT [DKT. 196]</u>**

1

### TABLE OF CONTENTS

INDEX OF AUTHORITY ................................................................................. ii

ISSUES PRESENTED ....................................................................................v

I.  PRELIMINARY STATEMENT ....................................................................1

II. LEGAL AUTHORITY ..............................................................................2

    A.  CONTINUING JURISDICTION ..............................................................2

    B.  SETTLEMENT AGREEMENTS ............................................................2

    C.  STRICT FORECLOSURE ....................................................................3

    D. COPYRIGHT .....................................................................................4

    E. TRADEMARKS VERSUS COPYRIGHTS ...............................................4

    F. ENFORCEMENT OF INJUNCTION ......................................................5

III. FACTS ....................................................................................................6

    A. SETTLEMENT ...................................................................................7

    B. DEFAULT .......................................................................................10

    C. DISPUTE CODE ...............................................................................15

    D. AMW CUSTOMER RELATIONSHIP MANAGEMENT ("CRM")
    SYSTEM...........................................................................................16

IV. PLAINTIFF'S MOTION IS MISREPRESENTATIONS,
       MALFEASANCE, UNCLEAN HANDS, AND HEARSAY .................17

V. CONCLUSION ..........................................................................................24

## INDEX OF AUTHORITY

| CASE | PAGE NUMBER |
| --- | --- |
| *Aro Corp. v. Allied Witan Co.*, 531 2d 1368 (6th Cir 1976) | 2 |
| *Cohn v. Kramer*, 136 F.2d 293, 295 (6th Cir. 1943) | 5-6 |
| *Daddy's Junky Music v. Big Daddy's Family Music Center*, 109 F.3d 275, 280 (6th Cir.1997) | 4-5 |
| *Downey v. Clauder*, 30 F.3d 681, 686 (6th Cir. 1994 | 5, n.2 |
| *Electrical Workers Local Union 58 v. Gary's Electrical* 340 F.3d 373, 379 (6th Cir. 2003) | 5 |
| *Express Welding, inc. v. Superior Trailers, LLC.*, 700 F.Supp. 2d 789 (E.D. Mich 2010) | 24 |
| *Field Enterprises v. Dep't of Treasury*, 184 Mich. App. 151, 158, 457 N.W.2d 113, 117 (1990) | 4 |
| *Freemont Ins. Co. v. Izenbaard*, 493 Mich. 859, 820 N.W.2d 902, 903 (2012) | 2-3 |
| *Innovation Ventures, LLC v. N2G Distrib., Inc.*, 763 F.3d 524, 544 (6th Cir. 2014) | 5 |

| CASE | PAGE NUMBER |
|------|-------------|
| *LFP IP, LLC v. Hustler Cincinnati, Inc.*, 810 F.3d 424, 426 (6th Cir. 2016) | 5 |
| *Liberte Capital Grp., LLC v. Capwill*, 462 F.3d 543, 551 (6th Cir. 2006) | 24, n.22 |
| *Lorillard Tobacco Co. v. Chester, Willcox & Saxbe*, 589 F.3d 835, 844 (6th Cir. 2009). | 2 |
| *Mahavisno v. Compendia Bioscience, Inc.*, 164 F. Supp. 3d 964, 968 (E.D. Mich. 2016) | 24 |
| *McDonald's Corp. v. Shop at Home, Inc.*, 82 F. Supp. 2d 801, 814 (M.D. Tenn. 2000) | 5 |
| *Microsoft Corp. v. Sellers*, 411 F. Supp. 2d 913, 921 (E.D. Tenn. 2006) | 5 |
| *Remark LLC v. Adell Broadcasting*, 817 F.Supp.2d 990, 1001 (E.D.Mich. 2011) | 2 |
| *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 439 n. 19 (1984) | 4 |
| *United States v. Hendrickson*, 822 F.3d 812, 820-21 (6th Cir. 2016) | 5 |

| STATUES AND RULES | PAGE NO. |
|---|---:|
| 17 U.S.C. § 102 | 4 |
| 17 U.S.C. § 106 | 4 |
| FRE 801 | 21-22 |
| FRE 802 | 21-22 |
| FRE 801 | 7 n.4 |
| Local Rule 7.1(a) | 15 |
| MCL 440.9620 | 3, 12-13 |
| **OTHER AUTHORITY** | **PAGE NO.** |
| 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*  (4th ed.2011) | 4 |

## ISSUES PRESENTED

1.      Should the Court order the Defendants Alan Williams, Mark Williams and

their Company AMW Machine Control, Inc. in contempt of court for violating this

Court's injunction which prevents Defendants' sale of Plaintiff's software?

> Plaintiff: YES

> Defendants: NO

2.      Should the Court compel Defendants Alan Williams, Mark Williams, AMW

Machine Control, Inc. and AMW Group, LLC to turn over all copies of their

software in order to enforce the settlement agreement entered between the parties?

> Plaintiff: YES

> Defendants: NO, Defendants dispute the factual basis presented by Plaintiff.

> Defendants have turned over all required software.

# I.  PRELIMINARY STATEMENT

A Do-Over.  We all remember being on the playground and hearing the full-throated roar of the aggrieved who over-estimated their own talents, skills, and abilities, and under-estimated the challenges of competition.  Typically, the aggrieved would misstate, or down-right lie about, the reality of the play that everyone had just witnessed with their own eyes.  With sufficient wailing and gnashing, the aggrieved hoped to convince friends and foes alike to stop everything, deny reality, rollback time, and allow a do-over.  The problem with allowing a do-over is that it allowed the aggrieved to exist in a state of denial.  Denial of their true talents, skills, and abilities.  Denial of the true challenges of competition.  Denial of what really happened.  Denial of reality.  Most children learn very early not to allow do-overs.  Allowing one do-over encourages the aggrieved to ask for 1,000 more.

Before the Court is the Plaintiffs' Motion for Contempt ("Motion") [Dkt. 196], which is nothing more than the Plaintiffs' full-throated wailing and gnashing, attempt to get the Court to grant a do-over.  Like the proverbial child on the playground, Plaintiff's Motion tries to mask material misstatements of facts and seeming out-right lies with volume, vehemence, and venality, in an attempt to get the Court to grant a do-over.  The Court ought to deny Plaintiffs motion in its entirety; reformulate the permanent injunction to conform with any findings of fact

1

made by the Court in adjudicating the Motion; and award Defendants actual attorney fees, costs, and such other remedies as the Court finds just and fitting.

## II. LEGAL AUTHORITY

There are not wholesale disagreements as to the applicable legal authority for the Court to consider.  The Plaintiff is correct in stating that Courts prefer settlement agreements.  *Steel v. Wilson*, 29 Mich.App. 388 (1971).

### A.  CONTINUING JURISDICTION

The Plaintiffs and Defendants also agree that this Court has the right to retain jurisdiction in order to enforce the settlement agreements. *Aro Corp. v. Allied Witan Co*., 531 2d 1368 (6th Cir 1976).  A district court has, "continuing authority to enforce a settlement agreement where the agreement is either incorporated into the court's final judgment or the court expressly retains jurisdiction over the agreement in such judgment." *Lorillard Tobacco Co. v. Chester, Willcox & Saxbe*, 589 F.3d 835, 844 (6th Cir. 2009).

### B.  SETTLEMENT AGREEMENTS

It is black letter law that "[s]ettlement agreements are a type of contract and are therefore governed by contract law. *Remark LLC v. Adell Broadcasting*, 817 F.Supp.2d 990, 1001 (E.D.Mich. 2011).  "In ascertaining the meaning of a contract we give the words used in the contract their plain and ordinary meaning that would

2

be apparent to a reader of the instrument." *Freemont Ins. Co. v. Izenbaard*, 493

Mich. 859, 820 N.W.2d 902, 903 (2012).

## C.  STRICT FORECLOSURE

Strict foreclosure is the foreclosure of personal property that is subject to a

security interest, and a discharge of any obligation for which the security interest

was held. This is permitted under Article 9 of the Michigan Uniform Commercial

Code.[1]  MCL 440.9620.  The secured party in a strict foreclosure takes physical

possession of collateral, and the debt for which the property served as collateral is

discharged as fulfilled.  *Id.*  Strict foreclosure is an effective remedy where the

creditor has a need or use for the physical property itself.  Geologic agreed that

Strict Foreclosure would be its sole remedy in the event of a default, provided none

of the debtors objected, "Secured Party [Geologic] agrees that it will first attempt

strict foreclosure of the Collateral [Dispute Code] if there is a default."

(Declaration of Thomas P. Heed, dated May 21, 2018 ("Heed Decl."), Exh. D,

Security Agreement, §7(c).)  Plaintiffs strictly foreclosed on the Disputed Code.

(Heed Decl., ¶29 and Exh. G, Notice of Strict Foreclosure.)

---

[1](1) Except as otherwise provided in subsection (7), a secured party may accept collateral in full or partial
satisfaction of the obligation it secures only if all of the following are met:
    (a) The debtor consents to the acceptance under subsection (3).
    (b) The secured party does not receive, within the time set forth in subsection (4), a notification of objection to
    the proposal authenticated by 1 of the following:
        (i) A person to which the secured party was required to send a proposal under section 9621.
        (ii) Any other person, other than the debtor, holding an interest in the collateral subordinate to the security
        interest that is the subject of the proposal.
MCL 440.9620.

3

## D. COPYRIGHT

A copyright owner has the following exclusive rights in his copyrighted work: (1) the right to reproduce the copyrighted work, (2) the right to prepare derivative works based upon the copyrighted work, (3) the right to distribute copies of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending, ... 17 U.S.C. § 106. Conversely, the copyright owner has the right to exclude others from exercising these rights.

*Field Enterprises v. Dep't of Treasury*, 184 Mich. App. 151, 158, 457 N.W.2d 113, 117 (1990).

## E. TRADEMARKS VERSUS COPYRIGHTS

Copyright law and trademark law protect different types of intangible property, prohibit different activities, and serve different purposes. *Sony Corp. of Am. v. Universal City Studios, Inc*., 464 U.S. 417, 439 n. 19 (1984). Copyright law concerns works of authorship, such as software, and gives the owner of the copyright the right to prevent copying of the copyrighted work. 17 U.S.C. § 102; 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 6:14 (4th ed.2011).  The Copyright Act protects the author/owner of a work, such as software, in the hope of encouraging and promoting innovation. McCarthy, *supra*, § 6:13. In contrast, the Lanham act is in large part about protecting consumers by preventing the use of a similar mark on such goods or services in a manner that would likely cause confusion.  *Id*. §§2:33.1 and 6:14. The Lanham Act is intended to prevent the likelihood of consumer confusion caused by the using someone else's protected symbol. *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family*

4

*Music Center*, 109 F.3d 275, 280 (6th Cir.1997). "[C]opyright and trademark law serve different purposes*." McDonald's Corp. v. Shop at Home, Inc.,* 82 F. Supp. 2d 801, 814 (M.D. Tenn. 2000). "[T]he Lanham Act and the Copyright Act provide separate remedies for the two distinct injuries and serve different public policies." *Microsoft Corp. v. Sellers*, 411 F. Supp. 2d 913, 921 (E.D. Tenn. 2006).

## F. ENFORCEMENT OF INJUNCTION

"A court's ability to issue injunctions, and then enforce those injunctions with a finding of contempt, springs from the court's inherent equitable powers." *Innovation Ventures, LLC v. N2G Distrib., Inc*., 763 F.3d 524, 544 (6th Cir. 2014). Additionally, "Courts have long held the power to modify injunctions, whether to narrow or broaden them." *LFP IP, LLC v. Hustler Cincinnati, Inc.*, 810 F.3d 424, 426 (6th Cir. 2016).

The elements for criminal contempt are that the defendants, "(1) had notice of a reasonably specific court order, (2) disobeyed it, and (3) acted with intent or willfulness in doing so."[2] *United States v. Hendrickson*, 822 F.3d 812, 820-21 (6th Cir. 2016). Civil contempt is available to coerce compliance with an injunction, or to compensate a party for specific damage. *Electrical Workers Pension Trust Fund of Local Union 58 IBEW v. Gary's Electrical Service* 340 F.3d 373, 379 (6th Cir. 2003). In a civil contempt proceeding for violation of an injunction, the burden of

---

[2] To warrant the imposition of criminal contempt sanctions, a party must willfully violate a specific, clear, and unequivocal court order." *Downey v. Clauder*, 30 F.3d 681, 686 (6th Cir. 1994).

proof rests on the movant.  *Cohn v. Kramer*, 136 F.2d 293, 295 (6th Cir. 1943).

"If the facts alleged as violation are neither admitted nor proven, the respondent

may not be adjudged in contempt. This is elementary law."  *Id.*

### III. FACTS

Plaintiff and Defendants were embroiled in six-and-a-half years of litigation

before this Court, concerning software that was partially written before Defendants

worked for Plaintiffs and partially written while Defendants worked for Plaintiffs

("Dispute Code").  *See generally, Geologic Computer Systems Inc. v. John*

*MacLean, et. al.*, Civil Action No. 10-cv-13569-AJT (E.D. Mich. Feb. 15, 2017).[3]

A multi-party settlement between Plaintiffs, Defendants, defendant AGPS (not a

party to the Motion), and third-party Pulsar Mechatronics ("Pulsar") was approved

by the United States Bankruptcy Court for the Western District of Michigan.  *In re*

*AMW Machine Control Inc.*, Bankruptcy Action No. 16-bk-2157-JTG, Order, Dkt.

100 (Bankr. W.D. Mich. Feb. 8, 2017) (hereinafter, "Bankruptcy Order," attached

as Exh. A to Heed Decl.). The approval of the Bankruptcy Court allowed the

parties to end this litigation through a settlement, which was subsequently

approved by this Court [Dkt. 194] and terminate the lengthy and loathsome

---

[3] The case opened Sept. 8, 2010 and closed Feb. 15, 2017.  The litigation drove Defendants AMW Machine Control Inc., AMW Group LLC, Mark Williams, and Alan Williams into bankruptcy court.  *See In re AMW Machine Control Inc.*, Bankruptcy Action No. 16-bk-2157-JTG (Bankr. W.D. Mich. 3/26/2018) (AMW Group LLC was party to *In re AMW Machine Control Inc.*); *In re Mark A. Williams*, Bankruptcy Action No. 16-bk-02208-JTG (Bankr. W.D. Mich. Mar. 8, 2017); and *In Re Alan Williams*, Bankruptcy Action No. 16-bk-46012-PJS (Bankr. E.D. Mich. Dec. 8, 2016).

litigation once and for all.  Or so everyone thought.

## A. SETTLEMENT[4]

On or about the week of January 18, 2017, Plaintiff, Defendants, defendant-AGPS Inc., and third-party Pulsar entered into a number of agreements ending the nearly six-and-a-half years of litigation in this case:  a Geologic Settlement Agreement ("GSA") (attached as Exh. B to Heed Decl.); a Security Agreement (attached as Exh. C to Heed Decl.); an Escrow Agreement (attached as Exh. D to Heed Decl.); an AGPS Settlement Agreement; and a Pulsar Technology Licensing Agreement ("TLA") (attached as Exh. E to Heed Decl).[5]  The Bankruptcy Order was issued February 8, 2017.  (Heed Decl., Exh. A, header.)  This Court dismissed the case February 15, 2017.  (Dkt. 194.)

The Bankruptcy Order has a number of relevant passages:

- WHEREAS, the parties entered into the GeoLogic Settlement Agreement and Release, a Stock Assignment, a Security Agreement, Software Escrow Agreement (Exhibit I), the AGPS Settlement Agreement and Release (Exhibit II), and the AMW Machine Control, Inc. Technology Licensing Agreement with Pulsar Mechatronics, Inc., a third party (Exhibit III) (all of which documents shall be collectively referred to herein as the "Settlement Documents").

- WHEREAS, ***Pulsar is paying GeoLogic $2,000,000 to give up its claim of ownership and to agree to dissolve the permanent injunction***.

---

[4] Since a finding of contempt is highly factual, Defendants are reproducing relevant passages of key documents within this Brief in order to improve cogency and assist the Court in its fact finding mission.

[5] Although Plaintiffs' Motion for Contempt ("Motion") included the Geologic Settlement Agreement, the Security Agreement, and the Escrow Agreement, it did not highlight relevant passages. Due to the size of these documents, Defendants are re-attaching them to this Response in Opposition to the Motion for Contempt ("Response"), with appropriate highlighting.

- WHEREAS, if there is a breach of the Settlement Documents, GeoLogic's rights are limited to ***strict foreclosure*** if no Defendant in the Litigation objects to the strict foreclosure.

(Heed Decl., Exh. A, Bankruptcy Order, p. 2-3.) (emphasis added.)

Defendants, Plaintiff, defendant AGPS, and Pulsar were all parties to the

GSA.  The GSA has a number of relevant passages:

- On or before December 31, 20 17, the Individual Defendants, AMW Corporate Defendants or Dealer shall pay a minimum of Fifty Thousand Dollars ($50,000.00) to Plaintiff. [hereinafter, "Initial Payment Provision".] [§1(a)]

- Each of the Defendants and Dealer represents and warrants to Geologic that the only persons or entities that could claim any rights, title, and interest in the computer software presently known as "AMW Works," whether in source code, object code, executable format, or otherwise, and any and all modules, improvements, revisions, upgrades, enhancements, and modifications thereto, including all future revisions, upgrades, enhancements  and modifications... [hereinafter, "Software Definition Provision."] [§3]

- Geologic will not challenge Dealer's right to use and exercise intellectual property rights in and to the Software, whether ***branded*** as "AMW Works" or otherwise, in whole or in part, whether in source code, object code, executable format, or otherwise, and any and all modules, improvements, revisions, upgrades and modifications thereto. Dealer shall have the right to use, sell, update, and modify any and all versions of its Software, whether ***branded*** as AMW Works or otherwise, and/ or create derivative works therefrom, as long as it does not sell compaction software. This Settlement Agreement does not permit Defendants or Dealer to use GeoLogic's name, ***trademarks***, photographs or history to sell the Software or its derivatives. [hereinafter, "Trademark Provision."] [§7]

- In the event that all or a majority of the stock of or all of the majority of the assets of (i) AMW MC are sold to a Third Party (i.e., a party who is not a Party to this Settlement Agreement) ... then at or before the time of that sale, transfer, or assignment ... AMW Corporate Defendants ... ***shall make a lump sum full payment*** ... of any outstanding balance owed to Geologic... [hereinafter, "Sale Provision."] [§9]

8

(Heed Decl., Exh. B, §§1, 3, 7, and 9, p. 2-5.) (emphasis added.)

The Security Agreement has a few relevant passages:

- *Grant of Security Interest.* Defendants and Pulsar hereby grant a security interest in:

    a. All right title and interest in and to the computer software presently known as "AMW Works," whether in source code, object code, executable format, or otherwise, and any and all modules, improvements, revisions, upgrades, enhancements, and modifications thereto, including future revisions, upgrades, enhancements and modifications (collectively referred to as "Software"). [hereinafter, "Security Interest Provision."] [§1(a)]

- *Remedies*.  If an Event of Default occurs...then:

    c. Secured Party [Geologic] agrees that it will first attempt strict foreclosure of the Collateral if there is a default.  [hereinafter, "Strict Foreclosure Provision."] [§7(c)]

(Heed Decl., Exh. C, §§1 and 7, pp. 1 and 4.)

The Escrow Agreement has three relevant passages:

- Defendants shall deposit with the Escrow Agent complete compilable copies of the up-to-date source code underlying Software (as defined in the Settlement Agreement) and copies of the up-to-date versions of the executable Software...

- Defendants shall deposit up-to-date versions of the Escrow Items on a quarterly basis.

- Once per calendar year until complete payment is made pursuant to Paragraph 1 of the Settlement Agreement, Geologic shall have the right, upon 14 days' prior written request and at Defendants' cost, to request source code testing of the Software witness by Charles Julian as a representative of Geologic to ensure that it compiles and that all modules open and run properly.

(Heed Decl., Exh. D, §1, p. 1.)

Pulsar and Defendants executed the TLA, which was approved by the

Bankruptcy Court, provided to Plaintiffs, and was generally part of this overall

9

settlement.   (Heed Decl., Exh. A, p. 2.)  This means that the Plaintiffs knew, or should have reasonably known, all the provisions in the TLA.  (*See Id*.)  The TLA references Defendants trademarks in three places.  (Heed Decl., Exh. E, §§1.7, 1.8, and 3.5.)  The TLA references a license server, also called a Customer Relationship Management ("CRM") system in six places.  (*Id*., at §§1.4, 1.22, 2.51, 7.2, and 16.3.6.1.)  The TLA even makes specific reference to a license server utility.  (*Id*., at § 2.51.)  The TLA definition of Software includes compilers and license server applications, *inter alia*, a much more expansive and comprehensive definition than that used in the GSA, Security Agreement, and Escrow Agreement.  (*Compare* Heed Decl. Exh. B, GSA, Software Definition Provision, §3 and Exh. E, TLA, §1.4.)  The TLA included a non-circumvention clause ("Non-Circumvention Provision") that prohibited Pulsar from attempting to frustrate the purposes of the TLA, directly or indirectly, by working in concert with others, including Geologic. (Heed Decl., Exh. E, TLA, §14.)

## B. DEFAULT

It is a truism of modern life that software and electronics rapidly go obsolete.  The Dispute Code has been subject to litigation for eight years. (Declaration of Mark A. Williams, dated May 21, 2018 ("Williams Decl."), ¶62.)  During that time, the Dispute Code has slowly become obsolete.  (*Id*., at ¶63.)  It is

the assessment of AMW that the market for Dispute Code is not nearly as large as was assumed at the time of the multi-party settlement discussions.  (*Id*., at ¶64.)

Under the GSA and TLA, Pulsar had primary responsibilities to make an initial payment of at least $50,000 by December 31, 2017 ("Initial Payment"). (Heed Decl., Exh. A, Bankruptcy Order, p. 2-3.)  In December, Pulsar told AMW that it might not make the required payment to Geologic.  (Williams Decl., at ¶66.) Cory Jantzi ("Jantzi"), the owner of Pulsar, is known to AMW to bluff, exaggerate, and otherwise say things in the heat of the moment that he does not really mean. (*Id*., at ¶67.)  Prior to entering into the TLA with Pulsar, AMW and Pulsar both formulated expectations of revenue and income from the deal. (*Id*., at ¶68.) Neither Pulsar nor AMW made as much money off of the TLA as had originally been planned.  (*Id*., at ¶¶69-70.)  AMW attributes the short-fall in revenue as being the result of progressive Dispute Code obsolescence.

On December 27, 2017, prior to the due date for the Initial Payment, counsel for the Defendants contacted counsel for the Plaintiffs via e-mail, inquiring as to the status of the Initial Payment and expressing an intention to make the payment should Pulsar fail to do so.  (Heed Decl., at ¶16 and Exh. F, Email.)  Counsel for the Plaintiffs, Faith Gaudaen of Kemp Klein ("Gaudaen"), indicated that payment

had not yet been made and that they had not heard from Jantzi.[6]  (*Id*.)  On January

2, 2018, AMW received an email from Jantzi, indicating that Jantzi would be

calling Kemp Klein.  (Williams Decl., at ¶72 and Exh. A, email.) Jantzi asked

whether AMW had made the payment to Geologic.  (*Id*.)  AMW reasonably

assumed that the topic of discussion between Jantzi and Kemp Klein was going to

be the Initial Payment, because any other purpose for the phone call would have

violated the Non-Circumvention Provision of the TLA, a term to which both Kemp

Klein and Pulsar were privy.  (*Compare* Id. at ¶72 and Heed Decl., Exh. E, TLA,

§14.)

Immediately after January 2, 2018, Jantzi went on vacation and was

incommunicado for two weeks.  (Williams Decl., at ¶73.)  He did not return and

respond to AMW e-mails until January 16, 2018.  (*Id.*)  On Monday, January 29,

2018, AMW sent Pulsar a default notice, as payment to Geologic still had not been

made.  (Williams Decl., at ¶74 and Exh. B, Pulsar Default Notice.)  That same

week, Geologic sent AMW a default notice.  (*Id.,* ¶75 and Exh. C, Geologic

Default Notice.)  The Geologic Default Notice set a twenty-day default period,

consistent with MCL 440.9620, the section of the Michigan Uniform Commercial

Code dealing with strict foreclosure of personal property pursuant to a security

---

[6] Nothing in Gaudaen's response could be taken as a request for immediate payment:  there was no wire instructions; there was no indication of where to send the funds; there was no indication of any preparedness to conduct the transaction on that date.  (Heed Decl., at ¶16 and Exh. F .)

interest.  (*Compare Id.*, at Exh. C and MCL 440.9620.)  There was no communication from Geologic or their counsel to AMW or their counsel between December 27, 2017 and February 2, 2018.  (Heed Decl., at ¶17.)

Counsel for the Defendants called Gaudaen on or about Monday, February 5, 2018, to tender the Initial Payment or otherwise attempt to resolve the default. (Heed Decl., at ¶19.)  Counsel for the Defendants was unable to reach Gaudaen, but left a voice message.  (*Id.*, at ¶20.)  On or about February 7, 2018, counsel for the Defendants again called Kemp Klein, attempting to speak with Gaudaen.  (*Id.*, at ¶21.)   He was informed that Gaudaen was out of the office and out of the country until February 20, 2018, two days before the default period ran out.  (*Id.*, at ¶21.)  He was also informed that Gaudaen would have only intermittent access to e-mails and voice mails.  (*Id.*)   On or about February 7, 2018, counsel for the Defendants placed a second call to Kemp Klein and spoke with Brian Rolfe ("Rolfe").  (*Id.*, at ¶22.)  Counsel for AMW once again offered to tender the $50,000 Initial Payment.  (*Id.*)  Rolfe was non-committal and said that Gaudaen would handle the matter when she returned.  (*Id.*)  On February 20, 2018, counsel for the Defendants received an e-mail from Gaudaen indicating that she needed to speak with Geologic prior to speaking with Defendants' counsel.  (*Id.*, at ¶23.) Apparently, the offer to tender of the $50,000 Initial Payment on or about February 7 had not been communicated to Geologic.  (*Id.*)  On or about February 21, 2018,

13

Gaudaen informed counsel for the Defendants that Geologic rejected the $50,000 and would accept nothing less than the full $2 million. (*Id.*, at ¶24.) On or about February 23, 2018, counsel for the Defendants once again spoke with Gaudaen and expressed a willingness to tender the $50,000 to continue the GSA for a matter of months. (*Id.*, at ¶25.) Counsel for the Defendants informed Gaudaen that AMW was in talks with another company that was intent on acquiring AMW assets ("Purchaser").[7] (*Id.*) Gaudaen dismissed the offer during the phone call. (*Id.*) On February 28, 2018, counsel for the Defendants spoke with Rolfe and informed him of the offer of $50,000 to continue the GSA during the talks between AMW and the Purchaser. (*Id.*, at ¶26.) Rolfe was noncommittal and indicated that Gaudaen was handling the Geologic matter. (*Id.*)

On March 2, 2018, AMW received a letter from Kemp Klein notifying AMW that Geologic had exercised strict foreclosure over the Dispute Code, even though it meant that Geologic forfeited up to $2 million under the Sale Provision of the GSA. (*Id.*, at ¶29, Exh. B, and Exh. G.) On March 16, 2018, counsel for the Defendants transmitted a letter to Gaudaen acknowledging the strict foreclosure and reminding Gaudaen that AMW was still in business and retained its trademarks.[8] (*Id.*, at ¶30 and Exh. H.)

---

[7] AMW and the Purchaser have executed a common interest agreement ("CIA"). (Heed Decl. ¶28.)
[8] This should not have been an issue because Geologic uses the name GeoSite for its commercial products, as noted in the GSA. (Heed Decl., at ¶30 and Exh. H.)

On March 30, 2018, AMW conveyed to Gaudaen a Letter of Intent ("LOI") to purchase the Dispute Code for a lump sum payment of $750,000.[9]  (*Id.,* at ¶31 and Exh. I.)  Geologic never really replied.[10]  The reaction of Geologic and their counsel to the LOI left Defendants with the impression that Geologic and their counsel had previously failed to grasp that strict foreclosure meant that Geologic forfeited the $2 million payment under the GSA Sale Provision.  (*Id.,* at ¶35 and Exh. B, §9.)  Geologic and their counsel disengaged from contact from April 17 until May 4, when Kemp Klein requested a Local Rule 7.1 conference for the present motion.  (*Id.,* at ¶36.)

## C. DISPUTE CODE

The Dispute Code, over 400,000 lines of source code, was incorporated in a product called AMW Works which is comprised of several modules that perform different functions.[11]  (Williams Decl., at ¶¶13 and 78.)    End-customers purchased AMW Works software through a network of dealers and distributors.  (*Id*., at ¶15.)

The transaction to sell a software license included loading the software onto a hard-drive of a computer or other electronic device capable of running the software; and receiving payment for the software license.  (*Id*., at ¶38.)  Once the

---

[9] Although this is less than the $2 million outlined in the Sale Provision of the GSA, it is still more than the Purchaser believed the Dispute Code to be work.

[10] The LOI required a response no later than April 13, 2018. (Heed Decl., at ¶31 and Exh. I.) Despite repeated attempts to establish contact with Geologic or their counsel, there was no response to the LOI prior to April 13, 2018. (Id., at ¶33.) On April 17, 2018, Geologic's counsel sent a terse e-mail saying that Geologic would only consider $10 million for the Dispute Code. (Id., at ¶34.)

[11] The AMW Works modules are Road™, Dirt™, Ditch™, Pipe™, Level™, and Topo™. (Williams Decl., at ¶ 14.)

license transaction was consummated for AMW Works, AMW provided the activated site code—a piece of data—that AMW Works used as a variable to activated the software.  (*Id.*, at ¶40.)  The end-user licenses that AWM issued for AMW Works were perpetual licenses to the original end-user.  (Declaration of William Homrich, dated May 21, 2018 ("Homrich Decl."), at ¶37.)  The activated site code was provided by AMW's CRM.

### D. AMW CUSTOMER RELATIONSHIP MANAGEMENT ("CRM") SYSTEM

AMW uses a CRM system to track dealers, distributors, end-user customers ("licensees"), and the software licenses associated with each of the foregoing.  (*Id.*, at ¶14.)  When creating an end-user licensee record, an identification number (ID) is assigned to the licensee, and pertinent information is associated with the ID, such as status, customer name, distributor, dealer, software programs that are licensed, max release date, and the number of uses.  (*Id.*, at ¶15.)  A use is an occurrence of a software module that is authorized to be used on a particular machine/hard-drive.  (*Id.*, at ¶16.)  One use occurs when the software is re-accessed (i.e., restarting the program).  (*Id.*, at ¶16.)  A secondary function of the AMW CRM system was to activate the AMW software, including AMW Works.[12] (*Id.*, at ¶17.)  Activation was effected by replacing a demonstration site code,

---

[12] The Dispute Code, as implemented in the AMW Works software, required an activation code generated by the CRM system in order to operate in anything other than demonstration mode.  (Williams Decl., at ¶18.)

preloaded into the software, with an activated site code.[13]  (*Id.*, at ¶¶24-28.)

Properly understood, the activated site code is a piece of data.  (Williams Decl., at

¶40.)

When subsequent changes to the customer record were required, a re-

activation of the software was performed, causing the software to update using the

same site code exchange process described above.[14]  (*Id.*, at ¶28.)  Re-activation

was not issuing a new license, but rather re-enabling an already existing license.

(*Id.*)  The activation process used by AMW could be performed by authorized

individuals outside of AMW, such as dealers and distributors.  (*Id.*, at ¶30.)

AMW's system for releasing software is not uncommon in the software

industry.  (*Id.*, at ¶19.)  At one time, Geologic used a software application called

Crypkey to generate activation/release codes for its software in a similar fashion to

that described herein.  (*Id.*, at ¶20.)

### IV. PLAINTIFF'S MOTION IS MISREPRESENTATIONS, MALFEASANCE, UNCLEAN HANDS, AND HEARSAY

Plaintiffs' quest for a do-over is so brazen as to be reckless.  Plaintiff took

possession of the Dispute Code on April 5, 2018 (*Pl. Mot. for Contempt*, Exh. 9,

Julian Decl., ¶2, ECF #196-10, Pg. ID 5203.) Plaintiff filed this Motion a scant 32

---

[13] The activated site code set switches which delivered to the end-user capability for specific software modules, number of uses, and a max release date.  (Homrich Decl., at ¶26.)  The system also captured and recorded the computer's hard drive number.  (Id., at ¶27.)

[14] Re-activation was also required for adding more uses, restoring uses after a significant internal clock time change event, transferring to a new machine, replacing a hard-drive, extending the max release date, and/or adding or deleting modules of software.  (Homrich Decl., at ¶ 29.)

days later, veritably screaming that the Dispute Code did not work. (*Id.*, at ¶4.) Plaintiffs' clear expectation is that they could take possession of 400,000 of complex machine control code from another company, introduce it to their own commercial system, and sell it within 32 days.  Plaintiffs' expectations are childish, exposing Plaintiffs' general lack of skill and understanding surrounding complex software.

Moreover, after telling this Court, in a sworn declaration, that the Dispute Code did not work, Plaintiff trumpeted its new product based on the Dispute Code in a press release on May 16, 2018.[15]  (Heed Decl., ¶39, Exh. J, Press Release from AgRePlan and Geologic.)  Clearly, Geologic had a version of the Dispute Code working well enough to test its accuracy and performance prior to May 16, 2018. (*See Id.*)  Plaintiff's sworn assertion that the Disputed Code was "incomplete and did not work" cannot be reconciled with the Plaintiff's press release made a mere nine days later.  (*Compare Id.* and Julian Decl., ¶2, ECF #196-10, Pg. ID 5203.) Furthermore, Plaintiff had a right under the Escrow Agreement to have AMW test and compile the escrow deposit—a right Plaintiff never exercised.  (*See* Heed Decl., Exh. D, §1, p. 1.)

At points in the Motion, the Plaintiffs seem to be at odds with themselves.

---

[15] The press release, jointly issued by John Wagner of AgRePlan and Charles Julian of Geologic, maintains that Geologic's implementation of the Dispute Code, "improves the accuracy and performance of equipment used in Agriculture, Construction and Landfills."  (Heed Decl., ¶39, Exh. J.)  A version of the press release from the website LinkedIn showed pictures of Geologic's working version of the Dispute Code in its GeoSite product.  (Id.)

18

At one point, Plaintiffs state that Defendants made a deposit of code into escrow on February 7, 2018, five days after the Geologic Notice of Default.  (*Compare Pl. Mot. for Contempt*, ECF #196, Pg. ID 5002-03 and Williams Decl., Exh. C.)  Later, the Motion maintains that Defendants had not provided an escrow deposit in five months.  (*Pl. Mot. for Contempt*, ECF #196, Pg. ID 5004.)  Point in fact, Defendants did provide an escrow deposit on February 1, 2018, and provided an e-mail to Gaudaen noting the same.  (Williams Decl., ¶79 and Exh. D, email copied to Gaudaen.)

Geologic maintains that AMW failed to provide several pieces of source code, including a file called bvsite2.pro, compilers, license generators, and geoids. (Declaration of Charles Julian, dated May 3, 2018 ("Julian Decl."), Exh. A, Pg. ID 5207.)  The Software Definition Provision provides that Geologic is entitled to, "source code, object code, executable format, or otherwise, and any and all modules, improvements, revisions, upgrades, enhancements, and modifications thereto, including all future revisions, upgrades, enhancements and modifications." (Heed Decl., Exh. B, GSA, §3.)  The Software Definition Provision does not cover bvsite2.pro, which is also not a required part of the software.  (Compare Heed Decl., Exh. B, GSA, §3 and Williams Decl., at ¶84.)  This file contains a password—data—not software, source code, object code, or executable code.  (*Id*.) The Dispute Code compiles using bvsite2.obj, an object containing the password

19

from bvsite2.pro.[16]  (Williams Decl., at ¶84.)  Geologic is free to create its own

bvsite2.pro file—its own password. (*Id.*)

Unlike the TLA, the compilers[17] were not included in the Software

Definition Provision of the GSA.  (Heed Decl., Exh. B, GSA, §3.)  It would be a

violation of the end-user license agreement for the compiler software for AMW to

copy it and just give it to Geologic.  (*Id.*, at ¶53.)  Plaintiff also complains about

the lack of third-party licensed geoid files.  (Julian Decl., Exh. A, Pg. ID 5207.)  It

seems as if Plaintiff is indifferent as to the copyrights and property rights of others.

Plaintiffs are free to purchase the compilers and geoid data from the appropriate

vendors.  Defendants have never refused to provide Plaintiff with the required

information for Plaintiff to purchase these licensed products:  Plaintiff has never

made such a request.

Plaintiff also wants access to the AMW CRM system, which it refers to as a

license generator.  (Julian Decl., Exh. A, Pg. ID 5207.)  The AMW CRM system

was not part of the agreement.  (*Compare* Heed Decl., Exh. B, GSA, and Heed

Decl., Exh. E, TLA, at §1.4.)  Plaintiff knew, or reasonably should have known,

that the GSA did not include the AMW CRM, because they were free to review the

TLA, which has many references to it.  (*Id.*)  It would be untenable to have

---

[16] The file bvsite2.pro can disable the password protection for all currently licensed versions of AMW Works. (Williams Decl., at ¶84.)  If this protection was disabled, each copy of AMW Works copied infinitely and for free.
[17] A compiler is a piece of licensed software, the copyright of which doe not belong to AMW.  (Williams Decl., at ¶54.)  The compiler would never be provided to an end-user as part of the AMW Works software.  (Id., at ¶53.)

Geologic accessing the AMW CRM system, because the AMW CRM system contains all of AMW's sensitive distributor, dealer, and licensee files.  The AMW CRM system would not work with Geologic's GeoSite software, anyway. (Williams Decl., at ¶85.)

John Wagner ("Wagner") of AgRePlan, Geologic's new business partner, provides a declaration that is both dishonest and an admission of potentially criminal conduct.  Wagner states that he recorded an electronic transaction between Tim Johnson and AMW's CRM on April 23, 2018.  (Declaration of John Wagner, dated April 25, 2018 ("Wagner Decl."), ¶9, ECF #196-11, Pg. ID 5231.) M.C.L. 750.540 makes it a felony for a third-party to record or copy an electronic communication, without authorization of both parties communicating.  *Id*.  AMW certainly did not authorize Wagner's attempted subterfuge.  (Williams Decl., at ¶77.)  More broadly, Wagner appears to be willfully, purposefully, and intentionally participating in conduct he believes violates this Court's Injunction. (Wagner Decl., ¶¶7-14, ECF #196-11, Pg. ID 5231.)

Plaintiffs Motion flagrantly attempts to present hearsay to the Court to prove the truth of the matter asserted.  The Motion included no declaration by Tim Johnson, Jake Johnson, or Christopher Markwardt, yet the Plaintiff tries to introduce their testimony to this Court.  (*See Pl. Mot. for Contempt*, ECF #196, Pg. ID 5005-06 and 5013-14.)  Defendants object to all references to Tim Johnson,

Jake Johnson, Christopher Markwardt, Rust Sales, or Matrix Sales under FRE 801-02.

Notwithstanding the foregoing objection, the transactions complained of in the Motion were re-activations and not licenses. The AMW CRM system was accessed by Matrix on April 23, 2018 to perform transactions related to ID 5457. (Homrich Decl., at ¶49.) According to the CRM system auto-generated email from November 9, 2017, Matrix licensed the Dirt software associated with ID 5457 on November 9, 2017. (*Id*., at ¶50.) On April 23, 2018, John Wagner and Jake Johnson from Matrix performed a re-activation; they did not license or otherwise purchase software. (*Id*., at ¶53.) No money changed hands between John Wagner, Jake Johnson, and Matrix, on the one hand, and AMW, on the other, with respect to the April 23, 2018 transaction. (*Id*., at ¶53.)

Similarly, the Motions allegations concerning Christopher Markwardt ("Markwardt") and Rust Sales are unfounded.[18] On information and belief, on March 27, 2018, Markwardt forwarded site code information to Nate Cook of defendant AGPS, an authorized CRM system user of the Pulsar Licensing Agreement, to perform a re-activation of ID 2585.[19] (*Id*., at ¶42.) Based on the sequential numbering of licensee IDs used by the AMW CRM shystem, the uses

---

[18] Markwardt was an authorized user of the AMW CRM system but his authorization was rescinded several years ago. (Homrich Decl., at ¶41.)
[19] The system was accessed twice for this ID: at 10:57:40 AM and 12:14:44 PM. (Homrich Decl., at ¶42.)

associated with ID 2585 were purchased and licensed several years ago. (*Id*., at
¶44.)   The re-activation process does not load AMW Works software.  (*Id*., at
¶45.)   During the re-activation process, AMW does not interact with the AMW
Works software.  (*Id*., at ¶46.)

    After this Motion for Contempt was filed, AMW turned off the AMW CRM
system for all re-activations, regardless of when the software license was
purchased or how many uses an end-user was entitled to under the license granted
by AMW and Geologic. (*Id*., at ¶47.)  AMW believes that Geologic is tortuously
interfering with the perpetual licenses granted to their prior licensees.

    Additionally, AMW believes that Geologic is purposefully, willfully, and
needlessly infringing its trademarks out of spite.[20]  (See Heed Decl., Exh. J, Press
Release.)  AMW notified Geologic on March 16 that it intended on still using its
marks.  (Id., Exh. H, March 16 Letter to Gaudaen.)  The GSA did not include any
assignment of trademarks.  (*See Id*., Exh. B, GSA, Software Definition Provision
and Trademark Provision, §§3 and 9, pp. 3 and 5.)  In the Trademark Provision of
the GSA, specific reference is made that the dispute code is currently branded [i.e.
trademarked] as AMW-Works.  (Id., GSA, Trademark Provision, §9, p. 5.)  The
Trademark Provision also specifically identifies Geologic's rights in its own
trademarks are not to be used under the GSA.  (*Id*.)  Since there is no specific

---

[20] The press release seems designed to use the AMW mark as many times as possible.  (*See* Heed Decl., Exh. J.)

reference to a license or transfer of the personal property of the AMW trademarks being transferred, standard contract interpretation means that the marks are stilled owned by AMW without express license to Geologic.  Additionally, there is no implied license, since Geologic never requested AMW make the Dispute Code.[21] *Mahavisno v. Compendia Bioscience, Inc.*, 164 F. Supp. 3d 964, 968 (E.D. Mich. 2016).  There is no fair use, because the Sixth Circuit does not recognize fair use of trademarks in a competitive environment.  *Express Welding, inc. v. Superior Trailers, LLC.*, 700 F.Supp. 2d 789 (E.D. Mich 2010).  Plaintiff seems to be dealing in self-help, violating the Lanham Act and causing market confusion.  This is prototypical unclean hands, meaning that the Court is well within its rights to refuse to even hear this Motion.  Moreover, with its partner John Wagner, Plaintiff seem intent on violating the injunction to prove that AMW is violating the injunction.

It almost goes without saying that there is no need to appoint a receiver.[22]

## V. CONCLUSION

The Plaintiff's Motion is unbelievable in its audacity.  The Plaintiff has

---

[21] In fact, Geologic opposed AMW creating the Dispute Code, which is why there is the instant litigation.  "An implied license arises where the following three element test is satisfied: (1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes the particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requester copy and distribute it."  *Mahavisno*, 164 F. Supp. 3d, at 968 (internal quotation omitted).

[22] "A district court enjoys broad equitable powers to appoint a receiver over assets disputed in litigation before the court."  *Liberte Capital Grp., LLC v. Capwill*, 462 F.3d 543, 551 (6th Cir. 2006).  In the instant case, the Plaintiff exercised strict foreclosure and have possession of the asset over which the parties litigated.  The Plaintiffs request for a receiver reeks of overreach—an aggrieved party loudly lashing out.

unclean hands, interfering, tortiously, with prior licensees; demanding that
Defendants commit copyright infringement, infringing Defendants' marks; and
sanctioning purported violations of this Court's injunction in an effort to prove
purported violations of this Court's injunction, *inter alia*.  The Plaintiffs
misrepresent the state of the escrow code, at one moment telling the Court how
defective it is and the next moment trumpeting to the world how well their version
of it works.  The Plaintiffs employ wholesale hearsay.  The Plaintiff's new partner
seemingly commits a felony to further the Plaintiff's arguments, and the Plaintiff
puts it in a Motion for the Court to see.  The Defendants respectfully request that
the Court (1) deny the Plaintiff's Motion in its entirety; (2) revise the permanent
injunction to exclude Plaintiff's use of Defendants' trademarks, trade name, and
trade dress; (3) revise the permanent injunction to allow Defendants' re-activation
of prior licensees of the Dispute Code, provided that no money changes hands; (4)
award Defendants actual attorney fees and costs; and (5) provide whatever
additional relief as the Court deems necessary in the interests of justice.

This Court should brook no do-overs.

Dated: May 21, 2018      Respectfully Submitted
              HEED LAW GROUP PLLC

              /s/ Thomas P Heed
              Thomas P. Heed
              2723 S. State Street, Suite 150
              Ann Arbor, MI 48104
              Telephone: (734) 794-4757
              theed@heedlawgroup.com


              **Attorney for Defendants**
                **AMW MACHINE CONTROL INC.**
                **AMW GROUP LLC**
                **MARK WILLIAMS**
                **ALAN WILLIAMS**

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 21, 2018, I electronically filed the foregoing Response in Opposition to Plaintiffs' Motion for Contempt, including a brief and associated exhibits, with the Clerk of the Court using the ECF system, which will be served by operation of the Court's electronic filing system upon the counsel of record for the Plaintiffs, at his/her e-mail address included in the ECF system.

Heed Law Group PLLC

/s/ Thomas P Heed

_____

Thomas P. Heed

27